UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

Case No. 12-31090

In re:                                                    Chapter 11

     RIDGE MOUNTAIN, LLC,

                    Debtor.

_____

| Appearances: | Attorneys for: |
|---|---|
| Douglas K. Clarke, Esq. | U.S. Bank National Association, successor |
| Steven E. Fox, Esq. | in interest to Bank of America, National |
| Brett J. Nizzo, Esq. | Association, as trustee for the registered |
| Riemer & Braunstein LLP | holders of J.P. Morgan Chase Commercial |
| Times Square Tower | Mortgage Securities Corp., Commercial |
| Seven Times Square, Suite 2506 | Mortgage Pass-Through Certificates, Series |
| New York, NY 10036 | 2004- CIBC9 |
| | |
| Lee E. Woodard, Esq. | Ridge Mountain, LLC, Debtor |
| David Capriotti, Esq. | |
| Wendy Kinsella, Esq. | |
| Harris Beach PLLC | |
| 333 West Washington Street, Suite 1200 | |
| Syracuse, New York 13202 | |

*FILED*
*OFFICE OF THE BANKRUPTCY CLERK*
*DEC 21 2012*
*SYRACUSE, NY*

## MEMORANDUM-DECISION AND ORDER

     Pending before the court is the Motion For Relief from the Automatic Stay filed by U.S.

Bank National Association, successor in interest to Bank of America, National Association,

successor by merger to LaSalle Bank National Association, as trustee for the registered holders

of J.P. Morgan Chase Commercial Mortgage Securities Corp., Commercial Mortgage Pass-

Through Certificates Series 2004-CIBC9 ("Bank") pursuant to 11 U.S.C. § 362(d)(1) and (2)[1]

(Doc. No. 14) ("Motion"). The Bank seeks relief in order to proceed with a foreclosure under

Tennessee law of a Deed of Trust that is currently the subject of a state court action pending in

Chancery Court for Hamilton County, Tennessee ("State court action"). Ridge Mountain, LLC,

the chapter 11 debtor, ("Debtor"), opposes stay relief (Doc. No. 30).

_____

[1] Unless otherwise noted, all sectional references are to Title 11, 11 U.S.C. §§ 101-1532 ("Bankruptcy Code" or
"Code").

The Bank further moved to excuse the receiver appointed in the State court action from turning over to the estate the cash receipts and properties which secure the Bank's two notes executed by the Debtor (Doc. No. 11) ("Receiver Motion"). By stipulation and order, the Debtor and Bank agreed that the receiver would continue to operate and remain in possession, management and control of the mortgaged properties, on an interim basis, which the receiver has done from the filing to the present. Separately, the Debtor moved to extend its exclusive period for the filing of and solicitation of acceptances for a chapter 11 plan. This motion remains pending.

After an initial delay, occasioned by an anticipated offer to purchase the underlying properties pursuant to a proposed § 363 sale which did not materialize, discovery proceeded. The parties stipulated to the non-contested facts[2] and the court conducted an evidentiary hearing on the Motion and related matters on October 18 and 19, 2012. Following the hearing, the parties were given the opportunity to submit post-hearing briefs and the matter was deemed submitted on November 16, 2012, when the parties filed their reply briefs. This memorandum-decision incorporates the court's findings of fact and conclusions of law based upon the record of proceedings before the court.

*Jurisdiction*

This court has jurisdiction and is authorized to enter a final order on the Motion and related matters pursuant to 28 U.S.C. §§ 1334 and 157(b)(A), (E) and (G).

*Factual Background*

The historical narrative preceding the filing is largely undisputed. Debtor owns two multi-family residential apartment buildings located in the State of Tennessee: (I) Mountain

---

[2] *See* "Joint Stipulation of Pertinent, Non-Contested Facts in Connection with Trustee's Motions for (I) Relief from the Automatic Stay and (II) Entry of An Order Excusing The State Court Appointed Receiver from Compliance with Section 543 of the Bankruptcy Code" at Doc. No. 68.

Brook Apartments, a 280-unit building located in Chattanooga ("Mountain Brook" or "Chattanooga Parcel"); and (II) Ridgemont Apartments, a 226-unit building located in Red Bank, a suburb of Chattanooga ("Ridgemont" or "Red Bank Parcel") (Mountain Brook and Ridgemont jointly referred to as "Mortgaged Properties"). In 2004, the Debtor executed two separate notes: (I) Note A in the original principal amount of $16,925,000; and (II) Note B in the original principal amount of $1,075,000. The Notes are secured by a Deed of Trust, Assignment of Leases and Rents and Security Agreement covering the Mortgaged Properties (collectively, "Loan Documents"). The Bank is the duly authorized holder of the Notes with the right to enforce all rights and remedies available under the Loan Documents.

Under the Debtor's management and exclusive control, the Mortgaged Properties fell into a state of disrepair. The Debtor's nonpayment of water and electricity bills resulted in the termination of essential services to the Mortgaged Properties. The structural integrity of the buildings was compromised and there were health, safety and welfare concerns. A portion of the Chattanooga Parcel that suffered fire damage went unrepaired. A number of apartments in both the Chattanooga and Red Bank Parcels became uninhabitable due to mold infestation. Admittedly, the Debtor was in default under the terms of the Notes and Deed of Trust. In addition to the Debtor's failure to timely pay ongoing utility charges—resulting in the disconnection of services, which constituted a default under the Loan Documents—the Debtor failed to pay taxes when due, resulting in multiple tax liens attaching to the Mortgaged Properties. These included: (i) a Notice of levy from the Internal Revenue Service in the amount of $18,155.30; (ii) a Notice of State Tax Lien filed by the Tennessee Department of Revenue; (iii) a Notice of State Tax Lien filed by the Tennessee Department of Labor and Workforce Development; and (iv) a Notice of Tax Lien filed by the Tennessee Department of Labor and

Workforce Development in the amount of $10,427.20. Debtor was further in default by its failure to keep the improvements in good repair, free of defects in materials and workmanship and structurally sound. Debtor was also in default by its failure to remain in compliance with applicable statutes and building codes governing the Mortgaged Properties including health, fire and safety regulations.

Due to the multiple, non-payment defaults,[3] the Bank accelerated the Notes and demanded payment in full from the Debtor. In September 2010, the State court action was commenced to appoint a receiver to control and manage the Mortgaged Properties. The State court, upon emergency motion of the Bank, appointed Daniel Ford of Freeman Webb Incorporated as receiver ("Receiver") to take possession of and manage the Mortgaged Properties and to receive and collect the future rents and profits. The Receiver has been in place since his initial appointment, the condition of the Mortgaged Properties has improved, and many of the vacant units have been brought back online. The Debtor pursued discussions with the Bank in 2011 for a potential purchase of the Loan Documents. The Debtor was also prepared to move for a return of the Mortgaged Properties to its possession and control. According to the Debtor, the Bank was amenable to doing this, conditioned upon the Debtor curing all payment arrears under the Loan Documents which had accumulated in the interim. Deprived of the interim income stream from the Mortgaged Properties and with no independent source of income, the Debtor claims it could not afford to pay the accumulated arrearages. In May 2012, the Bank served the Debtor with a Notice of Foreclosure. The Receiver continues in place and was in possession and control of the Mortgaged Properties when the Debtor filed its chapter 11 petition with this court on June 4, 2012. Since September 2010 when the Receiver was appointed, Debtor has made no payments of principal or interest on the Notes.

---

[3] Prior to acceleration, Debtor had been making regular payments on the Notes, although often late.

Debtor disputes amounts claimed by the Bank as due under the Notes. The Bank and Debtor also disagree on the fair market value of the Mortgaged Properties, which was the primary focus of the evidentiary hearing.

In addition to the Bank's claim that Debtor has no equity in the Mortgaged Properties, the Bank requests that this court separately find "cause" to grant relief from the stay. The Bank alleges "cause" due to (i) bad faith on the part of the Debtor based upon a conspiracy among the Debtor, Debtor's counsel and a third party group to "keep" the property for themselves and delay and deprive the Bank of its rights as a secured creditor; and (ii) a lack of adequate protection.

First Salina Properties, Inc., the managing member of the Debtor, owns 99% of the Debtor and John Gosnell owns the remaining 1%. Patrick Phelan signed the bankruptcy petition as President of First Salina Properties, Inc. ("First Salina"), Debtor's managing member. Mr. Phelan has not appeared in that capacity at any of the proceedings before this court and was in Ireland on the return date of the evidentiary hearing. In his stead, John Delaney appeared as the designated representative of the Debtor. Mr. Delaney is one of three directors of First Salina, with Mr. Phelan and Mr. Gosnell. Mr. Delaney became a director of First Salina in May 2012. He testified that the only directors' meeting he attended was in May 2012 to authorize the filing of bankruptcy. Prior to that time, Mr. Delaney, an attorney, had variously represented Mr. Gosnell and the Debtor, in its initial formation and acquisition of the Mortgaged Properties and, subsequently, when consulted. Mr. Delaney is listed by the Debtor in its schedules as an unsecured creditor owed $65,000. Delaney testified to undertaking negotiations with the Bank to float potential offers to purchase the Loan Documents by third parties. After the Bank rejected a number of lower purchase offers, Mr. Delaney testified that the loan servicer for the Bank suggested that he would present for consideration to the committee at the Bank and deem

reasonable an offer of $15.6 million. The loan servicer denies that any such representation was made.

One of the groups involved in proposing to purchase the Mortgaged Properties consisted of the threesome of Andrew Larew of Larew, Doyle & Associates, Anthony Fiorito of Partnership Properties, Inc. ("PPI"), and John Funicello of JF Real Estate Brokerage ("JF") (collectively, the "Larew Group"). Mr. Larew arranges debt and equity for clients, makes private investments and advises with respect to the same. He had initially been contacted by Mr. Delaney to offer financial advice to the Debtor. Mr. Larew introduced the Debtor to his other two business colleagues, Messrs. Fiorito and Funicello. The formal purchase offer was to be made by PPI and JF. The Larew Group had direct discussions and a tacit agreement with Patrick Phelan that if they were successful in acquiring the Mortgaged Properties that Phelan would be hired as a consultant and paid $500,000. Delaney testified that if the $500,000 consulting fee to Phelan materialized, that Phelan agreed to pay him a $65,000 success fee. Delaney testified that the Debtor owed him $45,000 for pre-petition attorney services and that the $65,000 figure listed on the Debtor's schedules was in error and did not represent the conditional success fee promised to him by Patrick Phelan.

The Bank alleges that the Larew Group has been in control of the Debtor's affairs and secretly directing the chapter 11 proceeding. It claims that the Larew Group selected Debtor's counsel and paid Debtor-counsel's retainer and paid the fees of the Debtor's appraiser who testified at the hearing. The Bank claims that Debtor's counsel did not disclose the source of its retainer nor disclose to the court an alleged guarantee by the Larew Group to pay for any additional Debtor-counsel's fees that exceed the initial retainer.

The evidence demonstrates that Larew and his colleagues each funded 1/3 payment of Debtor-counsel's retainer in the form of three cashier checks that were made payable to the Debtor, which were then endorsed by Patrick Phelan on behalf of the Debtor and hand-delivered to Harris Beach. The Debtor's schedules list $51,639.00 as an unsecured debt owed to Larew, Doyle & Associates. Debtor-counsel's retention application recites that its retainer was from the Debtor.

The Bank places great weight upon two emails. First, a May 31, 2012 email sent by Andrew Larew to Mr. Lee Woodard of Harris Beach. In it, Mr. Larew states: "Should we become a DIP, and if it is approved by the court, and the billable time is beyond the $50,000, Harris Beach will be covered." The second email is from Attorney Lee Woodard and directed to Andrew Larew and Patrick Phelan on July 2, 2012. A proposed draft of an Asset Purchase Agreement is attached with the message: "With the motion for relief pending, it would be a huge help to finalize the APA and get a motion filed as soon as possible. A showing o[f] (sic) real interest will convince the court to keep US Bank locked into the bankruptcy." The Bank relies upon these emails to establish: first, that Harris Beach had an undisclosed guarantee of its counsel fees from an interested party who would be advancing an offer to purchase the Debtor's assets; and second, that the purchase offer was not a bona fide offer but was advanced solely as a dilatory tactic to conspire against the Bank in its efforts to obtain stay relief, evidencing bad faith on the part of Debtor, Debtor's counsel and the Larew Group.

At the evidentiary hearing, the Bank presented the testimony of: (i) Rudolph Vasquez, an employee of C-III Asset Management LLC that serves as loan servicing agent for the Bank; (ii) Daniel Ford, Director of Property Management for Freeman & Webb Company Realtors, who was appointed as the Receiver in the State court action; (iii) Richard P. Perutelli of Integra

7

Realty Resources, as an expert appraiser; and (iv) Anthony Fiorito, President and sole owner of

PPI. The Debtor offered the testimony of: (i) Max Donald Poore, of CBRE, Inc.[4] who testified

as an expert as to the value of the Mortgaged Properties; (ii) John M. Delaney, Esq. of Delaney

and O'Connor; and (iii) Andrew E. Larew of Larew, Doyle & Associates. The Bank called

James A. Funiciello, chief executive officer of PPI. In addition to live testimony, both the Bank

and the Debtor presented a number of documentary exhibits, largely pertaining to the condition

and valuation of the Mortgaged Properties. This court's evaluation of all of the evidence, as

measured against the applicable legal standard, follows.

### *Discussion*

### I.  Relief from the Stay – § 362(d)(1)

In pertinent part, section 362(d)(1) provides that the court shall grant relief to a party

seeking modification of the automatic stay "for cause." The Bank's conspiratorial theory would

have this court find "cause" by imputing bad faith to the Debtor, Debtor's counsel and the Larew

Group. Upon a review of the entire record, the court declines to find affirmative evidence of bad

faith on the part of any of the actors.

The checks intended to fund the retainer for Debtor's counsel—made payable to the

Debtor, then endorsed over for payment to Harris Beach—constituted an advance or loan to the

Debtor, which was disclosed on the Debtor's schedules in the exact dollar amount.[5] Although the

loan might have been better documented by the execution of a formal note, the source of the

funds are easily traceable and are readily admitted by the parties. Whether the Debtor originally

had funds of its own or was lent the funds by a third party, the court finds that it was not a

---

[4]  CRBE was formally C.B. Richard Ellis. Tr. at 264.
[5]  Although the Debtor lists on its schedules the unsecured debt as owed to Larew, Doyle and Associates, testimony at the hearing suggested that the more accurate characterization is that the Larew Group advanced the funds to the Debtor.

misrepresentation by Debtor's counsel to indicate that the Debtor paid the retainer. Questioning at the first meeting of creditors or upon a deposition could readily uncover additional information concerning how Debtor had the funds to pay its counsel's retainer which was forthcoming. In the present case, the Debtor's only income stream emanates from the Mortgaged Properties which constitute the Debtor's only assets. Since these assets were and remain in the exclusive control of the Receiver, it would be expected that the Debtor would not have $50,000 of its own but would have to borrow the funds in order to cover its counsel's retainer. In hindsight, a full and accurate disclosure would have required counsel to fully respond to the questions posed on official form 203, "Disclosure of Compensation of Attorney for Debtor" required by Federal Rule of Bankruptcy Procedure 2016.[6] Counsel also would have been well advised to disclose in its retention application that the source of funds to pay its retainer was a loan obtained by the Debtor from the Larew Group. Notwithstanding these omissions, the court does not infer any bad faith on the part of counsel from either its silence or the representations made to the court on this issue.

Nor, from the May 31 email does the court jump to the conclusion reached by Bank's counsel that Debtor's counsel had a secret guaranty which it failed to properly disclose to the court. Harris Beach flatly denies this. Mr. Larew is not an attorney and his email was likely intended only to communicate that if his group stepped in as a DIP Lender, then the lending facility would pay for allowed, Debtor-counsel's fees in excess of $50,000. As an esteemed member of this District's panel of chapter 7 trustees and a senior counsel whose integrity in the legal community is unimpeachable, this court rejects the specious attacks on Mr. Woodard's reputation and that of his firm.

---

[6] Counsel's § 2016(b) Disclosure of Compensation of Attorney statement was actually incomplete in that it failed to respond to Questions 1 and 2 as to what had been received by counsel prior to the filing of the statement or the source of the compensation paid.

As to any nondisclosure of future consultant and/or success fees proposed to be paid to Messrs. Phelan and Delaney, no court filings were ever made presenting a purchase offer and requesting a hearing on a proposed § 363 sale. Thus, there were no representations nor disclosures made one way or another.

The fact that the Debtor requested an adjournment of the initial hearing on the Motion to allow a purchase offer to be presented does not, in this court's opinion, warrant further inquiry. The parties' mistaken belief that a $15.6 million offer might be accepted by the Bank does not equate to bad faith. The explanation proffered that the offer was withdrawn and not submitted upon learning that the Bank would reject the offer and that a $150,000 deposit would be forfeited satisfies the court that the process was not tainted by bad faith. Accordingly, the court dismisses all allegations of bad faith.

The Bank's argument that it is entitled to adequate protection under § 362(d)(1) is undercut by the fact that the value of the Mortgaged Properties has been increasing and not declining during the tenure of the Receiver and throughout the pendency of the bankruptcy proceeding. Accordingly, the court turns its attention to the allegations under §362(d)(2) on which the evidentiary hearing focused.

**II. Relief from the Stay - § 362(d)(2)**

The Code provides that the court shall grant relief from the automatic stay if "(A) the debtor does not have equity in [the subject] property; and (B) [the] property is not necessary to an effective reorganization[.]" 11 U.S.C. § 362(d)(2). The party seeking relief from the stay has the burden to show the debtor lacks equity in the subject property and the party opposing the relief bears the burden "on all other issues[.]" § 362(g); *see, e.g., In re 347 Linden LLC*, Nos.

11-CV-1990, 11-CV-2201, 11-CV-2202, 2011 WL 2971496 (E.D.N.Y. July 20, 2011); *In re 160 Bleecker Street Assocs.*, 156 B.R. 405, 410 (S.D.N.Y. 1993).

## A. Debtor's Equity in the Mortgaged Properties [7]

The Bank argues that Debtor lacks equity in the Mortgaged Properties. The Bank asserts that the current value of the Mortgaged Properties is, at most, $22,550,000 and more likely significantly less, while the liens against the Mortgaged Properties total approximately $25 million. Debtor responds that the Bank has not met its burden in establishing that Debtor lacks equity in the Mortgaged Properties. Debtor asserts the current value of the Mortgaged Properties to be not less than $22,550,000, while the total liens are at most $21.5 million.

### (1) Current Value of the Mortgaged Properties

To establish value, the Bank offered the appraisals and testimony of R. Paul Perutelli ("Perutelli") of Integra Realty Resources. Perutelli inspected the Mortgaged Properties on January 5, 2012,[8] the effective date of his appraisals. Tr. at 155; Ex. 9, 1-2; Ex. 10, 1-2. Perutelli conducted extensive market research, interviewed persons including the Mortgaged Properties' maintenance staff, and reviewed public records as well as financial and property condition reports provided by the Receiver. Perutelli arrived at his valuation, summarized below, using the Sales Comparison and Income Capitalization approaches. Perutelli placed primary emphasis on the latter approach. Ex. 9, at 77-78; Ex. 10, at 82-83; Tr. at 160-161.

In response, Debtor offered the appraisals and testimony of Max Donald Poore ("Poore") of CBRE, Inc. Poore inspected the Mortgaged Properties on September 7, 2012, the effective

---

[7] Where applicable, the court has adjusted for the following:
    (a)  the amount of the Bank's lien, per the Bank's letter dated November 21, 2012 submitted with the Bank's proof of claim (Doc. No. 89); and
    (b)  the acknowledged error of Debtor's appraiser who failed to account for a 1% collection loss in his calculations of the value of the Red Bank Parcel. Tr. at 309-310.

[8] Perutelli appraised the properties twice before, in January 2010 and in February 2011. Tr. at 157-158.

date of his appraisals. Tr. at 268; Ex. A, 1; Ex. B, 1. Like Perutelli, Poore conducted extensive market research, interviewed various persons including the Mortgaged Properties' maintenance staff, and reviewed public records and certain of the Receiver's financial reports. Unlike Perutelli, however, Poore was provided certain financial data, specifically data typically detailed in a property condition report, not by the Receiver but by Chris Kinder ("Kinder") of Larew, Doyle & Associates, who had retained Poore's services on Debtor's behalf. Acknowledging that he was not provided a property condition report for the Mortgaged Properties despite his request, Poore noted that, accordingly, his appraisal was subject to an "extraordinary assumption" that the numbers provided by Kinder accurately reflected the costs associated to remedy the out-of-service units, i.e., deferred maintenance. Ex. A, at vii-viii; Ex. B, at vii-viii; Tr. at 265-266. Poore arrived at his valuation, summarized below, using both the Sales Comparison and Income Capitalization approach. Like Perutelli, Poore placed primary emphasis on the latter approach. Ex. A, at 59; Ex. B, at 61; Tr. at 269.

| Mountain Brook / Chattanooga Parcel | Perutelli | Poore |
|---|---|---|
| Prospective Value at Stabilization | $ 12,200,000 | $ 13,900,000 |
| Market Value "As-Is" on effective date | $ 10,700,000 | $ 13,300,000 |
| **Ridgemont / Red Bank Parcel** | | |
| Prospective Value at Stabilization | $ 10,100,000 | $ 9,500,000 |
| Market Value "As-Is" on effective date | $ 9,300,000 | $ 9,250,000 |
| **Aggregate Value of the Mortgaged Properties** | | |
| Prospective Value at Stabilization | $ 22,300,000 | $ 23,400,000 |
| Market Value "As-Is" on effective date | $ 20,000,000 | $ 22,550,000 |

In determining the Mortgaged Properties' current or "as-is" value, the court must reconcile Perutelli's and Poore's appraisals. In so doing, the court notes that both Perutelli and

Poore gave credible testimony and provided detailed written appraisals. The court agrees that the Income Capitalization approach is the most appropriate valuation method and notes that the appraisers' methodologies are virtually identical. Accordingly, the court adopts the Income Capitalization formula used by both appraisers— with limited exceptions.

In short, the Income Capitalization approach results in an "as-is" value for an income producing property by first calculating a "stabilized" value and then subtracting the estimated costs that are required to bring the property up to stabilization. At stabilization, it is assumed that all rental units are in operation and available for lease and that all rentals are at market rates. Calculating a property's "stabilized" value begins by determining an effective gross income by adding non-rental income to potential gross rent—again based on prevailing market rates— and deducting a vacancy and a collection loss allowance, which are percentages of possible revenue assumed lost, respectively, to periodic vacancies or costs associated with the collection of delinquent rents. Next, net operating income ("NOI") is generated by subtracting the operating expenses, which include, inter alia, real estate taxes and a replacement reserve, from the effective gross income. The value at stabilization is the quotient of the net operating income divided by the capitalization rate.

It is not contested that the Mortgaged Properties are not stabilized. The Receiver testified that, as of the hearing, 17 units at Ridgemont and 24 units at Mountain Brook were out-of-service, due primarily to mold or fire damage. Tr. at 123-128. Although both appraisers suggested that stabilization could occur within a 5 month period from their respective inspection dates, their projections assume sufficient income to remedy the problems with the out-of-service units, which the Receiver testified is not presently available. Tr. at 145.

Turning to the court's valuation, the court recognizes that Poore had the advantage of nine additional months of market data and, therefore, accepts that the average market rent for the units at Mountain Brook is $620 per month, and, at Ridgemont is $600 per month. For similar reasons, the court also accepts Poore's estimate of the Mortgaged Properties' non-rental income. Perutelli and Poore agreed that a collection loss of 1% is appropriate, but disagreed as to the appropriate percentage for vacancy loss. Perutelli suggested a 6% vacancy rate, while Poore suggested 5%. As the proffered vacancy loss percentages are a mere percentage point apart— and given that the parties' arguments do not address the vacancy loss— the court has simply averaged the two rates.[9] Based upon these figures, the court calculates an effective gross income for Mountain Brook of $2,026,987 ($7,239/unit) and, for Ridgemont, $1,594,586 ($7,056/unit).

Based upon the parties' contentions, the court separated the operating expenses for the Mortgaged Properties into three categories: real estate taxes, replacement reserves, and other expenses. The parties disagree as to the appropriate amounts for the first two categories and make no arguments as to the third. The court discusses each in turn.

In regard to the real estate taxes for the Mortgaged Properties, the court recognizes that in late 2011, the Receiver prevailed on an appeal of the tax assessment for the Mortgaged Properties, thereby reducing the assessment for the properties by just over 40%. The court notes, however, that the reassessment was based, in part, upon the impaired condition of the Mortgaged Properties and that the reassessed values are significantly, by 45-50%, less than the values being advanced by the parties.[10] In their respective appraisals, Perutelli used the pre-appeal tax assessment, while Poore used the tax figures as they currently stand. Perutelli acknowledged that

---

[9] The court notes that Poore also deducted a percentage of gross rent as "Loss to Lease" in calculating effective gross income. Ex. A, at 47, 60; Ex. B, at 45, 58. The court finds that such a deduction runs counter to the mark-to-market assumption that underlies the Income Capitalization approach as testified to by both appraisers, and thus the court declines to include such a figure in its calculation of value.

[10] The presently-assessed aggregate value for the Mortgaged Properties is $11.6 million. Ex. A, at 34; Ex. B, at 32.

he used tax figures that were inaccurate at the time of his report. He also stated that, notwithstanding this, his figures were "right as far as adjusting [them] to stabilized value." Tr. at 202. Perutelli explained that for purposes of stabilized value, a potential buyer would assume a fully operational property at market conditions, which necessarily includes tax rates based on market value and market income. Tr. at 203-205. The court agrees with Perutelli and finds that a potential buyer, presented with the facts related to the Mortgaged Properties, would adopt the higher tax figure in anticipation of a future increased assessment.[11] Accordingly, the court has included real estate tax expenses of $219,439 for Mountain Brook and $139,939 for Ridgemont.

As to replacement reserves,[12] Perutelli allowed $290 per unit while Poore allowed $200 per unit. Both appraisers indicated that the age and condition of a property bear upon the appropriate value for the replacement reserve. Poore offered that a reserve in the range of $150 to $300 per unit is generally appropriate, while Perutelli indicated, as supported by a national investor survey, that the range varied from $150 to $750, with an average value of $294 per unit. The Bank points out that the Receiver testified that given the age of the Mortgaged Properties, he would, if required, typically provide for a $400 per unit reserve. Tr. at 139-140. Based upon its review of the evidence, the court finds that Perutelli's replacement reserve amount of $290 per unit is the most appropriate.

As to the final expense category, the court notes that the amounts listed by the appraisers in the other expenses category are quite similar and, when totaled, differ by an amount representing 2.6-2.7% of the totals for Mountain Brook and 3.3-3.5% of the totals for Ridgemont. The court has averaged the total other expenses offered in the appraisals for the same reasons it averaged the vacancy loss percentages.

---

[11] The court notes that Perutelli indicates in his appraisal that the properties are scheduled for reassessment in 2013.
[12] As defined by Perutelli, replacement reserves "reflect costs of replacing short lived items such as appliances, air conditioning equipment, carpeting, and drapes." Ex. 10, at 76.

Using these expense figures, the court calculates NOI at $831,050 ($2,968 per unit) for

Mountain Brook and $613,020 ($2,712 per unit) for Ridgemont.   The court finds that a

capitalization rate of 6.5%, as determined by Poore, is appropriate.   In reaching this conclusion,

the court notes that Poore's appraisal was more proximal to the hearing date and Perutelli, who

used a capitalization rate of 7.7%, acknowledged that capitalization rates had trended downward

since his appraisal in January 2012.   Thus, the court calculates stabilized values for the

Mortgaged Properties of $12,785,385 for Mountain Brook and $9,431,077 for Ridgemont.

To reach the Mortgaged Properties' current value, the court adopts the adjustments made

by Perutelli in his appraisals.   The court has subtracted from its stabilized values amounts for

deferred maintenance, lease-up costs, and entrepreneurial profit on the deferred maintenance.[13]

The court finds that the deferred maintenance amounts used by Perutelli—less a small

percentage[14] to accommodate deferred maintenance performed in the months since Perutelli's

appraisal—are the most reliable.   The court rejects the deferred maintenance amounts used by

Poore as those amounts were provided by Kinder, who, among other things, never visited the

Mortgaged Properties.   The court finds that the total adjustment to stabilized value required to

reach current value is $1,365,519 for Mountain Brook and $759,251 for Ridgemont.

Completing the calculation, the court arrives at "as-is" values for the Mortgaged

Properties of $11,419,865 for Mountain Brook and $8,671,826 for Ridgemont.   Rounding these

values in favor of the Debtor, the court finds that the current value of Mountain Brook is

---

[13]   The court notes that Poore did not provide an adjustment for entrepreneurial profit on deferred maintenance.
Poore provided, however, what is, in this court's opinion, a nominal profit in his lease-up calculation.   Whether this
calculation was intended to address an adjustment for entrepreneurial profit on deferred maintenance is unclear.
Nevertheless, the court agrees with Perutelli that a potential purchaser would look for a return on investment on
funds spent to bring a non-stabilized property up to stabilization.
[14]   The court has reduced Perutelli's deferred maintenance figures by 6.5% based upon the Receiver's testimony,
inter alia, that less than 10% of the required deferred maintenance as determined in a March 2011 report had been
performed and that, of that list, the "big ticket items" had not been performed.   Tr. at 134.

$11,450,000 ($40,893 per unit) and for Ridgemont is $8,700,000 ($38,496 per unit) or, in the aggregate, $20,150,000.

The court's findings are detailed in the chart at Appendix A, which compares the court's findings to the appraisals of Perutelli and Poore.

### (2) Liens Against the Mortgaged Properties

The Bank claims that there are five liens that have been entered against the property: (1) its lien, which it values at $23,592,320 as of the petition date; (2) a personal injury judgment in the amount of $1,197,500 in favor of Amie Wingfield for damages related to mold exposure while a tenant of the Mortgaged Properties ("Wingfield Judgment");[15] (3) an $80,000 tax levy by the Internal Revenue Service; (4) a tax lien in the amount of $11,000 in favor of the Tennessee Department of Labor and Workforce Development; and (5) a tax lien in the amount of $100,000 in favor of the Tennessee Department of Revenue. The aggregate value of the asserted liens is $24,980,820.

Debtor asserts that the Bank improperly included certain charges in its claim and otherwise failed to establish the existence of the remaining asserted liens. Debtor contends that the only valid lien on the Mortgaged Properties is the Bank's lien, a fact it notes was stipulated by the parties. Debtor contests the amount of the Bank's lien and therefore claims that the total of the liens against the Mortgaged Properties is, at maximum, approximately $21,500,000.

### (a) The Bank's Lien

By letter dated November 21, 2012 (Doc. No. 89), the Bank amended downward its claim from $23,610.816 to $23,592,320.[16] Debtor contests the inclusion in the Bank's claim of

---

[15]  The Bank correctly notes that under Tennessee Law as of the time the judgment was entered, the Wingfield Judgment is subject to post-judgment interest at a statutory rate of 10%. From the time of its entry up to the filing of the petition, the judgment accrued interest of $86,286.
[16]  *See* Appendix B for a line-item breakdown of the Bank's claim.

amounts for Default Interest, Late Charges, and "defeasance" and "prepayment" charges ("Yield Maintenance Charges") as indicated below.

| The Bank's Claim | Note A | Note B | Total |
|---|---|---|---|
| Principal, Interest, and Uncontested Charges | $ 18,028,212 | $ 1,424,123 | $ 19,452,336 |
| Contested Items: | | | |
| (a) Late Charges | $ 247,746 | $ 29,789 | $ 277,536 |
| (b) Default Interest | $ 1,676,122 | $ 107,711 | $ 1,783,833 |
| (c) Yield Maintenance Charges | $ 1,823,722 | $ 254,894 | $ 2,078,616 |
| Total | $ 21,775,803 | $ 1,816,518 | $ 23,592,320 |

Debtor argues that it is "inequitable" to include the Default Interest and Late Charges in the Bank's claim.[17]  Debtor asserts that the charges were incurred after the appointment of the Receiver in September 2010.  Debtor further asserts that, as of the date of the Receiver's appointment, it was current on its payments to the Bank and, since the Receiver's appointment, it has not been able to avoid the accrual of these charges.

Upon review of the Bank's loan records, the court finds that $161,598 in Late Charges, or approximately 60%, were assessed before the appointment of the Receiver.[18]  Debtor's suggestion that the Receiver had the ability to make payments on the Bank's debt yet failed to do so is contradicted by the Receiver's testimony that there was no excess cash flow to make payments to the Bank until quite recently. Tr. at 128-129, 140-141. The Receiver's testimony is supported, in part, by the Receiver's report dated September 16, 2011. It indicates that in May 2011 the Receiver, pursuant to the terms of the final court order appointing him, requested funds because "present occupancy and related cash flow does not allow for the properties to fund the

---

[17] Debtor does not assert, nor could it credibly do so, that the Bank was not entitled to these charges pursuant to the express terms of the notes. Exs. 1 and 2, ¶¶ 1.06, 1.07 (included as Appendix C).
[18] 27 of the 48 late charges imposed on Note A and 33 of the 55 late charges imposed on Note B. Ex. 4.

necessary expenses and repairs." Ex. 12. Notably, the Receiver also testified that he never received any complaint from the Debtor regarding his management of the Mortgaged Properties. Tr. at 130. The court is mindful that the Receiver's appointment was necessitated due to Debtor's failure to properly maintain the Mortgaged Properties in the first instance. Ex. 8; Joint Stip., at 4-7.

The court rejects Debtor's equitable argument regarding Default Interest and Late Charges as its factual assertions are largely belied by the evidence and, given the circumstance of Debtor's management of the Mortgaged Properties, Debtor does not invite equity. *See generally McQuiddy v. Ware*, 87 U.S. 14, 19-20 (1873). Accordingly, the court finds that the Bank's claim should include the $1,783,833 in Default Interest and $161,598 in Late Charges,[19] making the Bank's claim, at a minimum, $21,397,767.

Based upon the court's conclusions thus far, it is unnecessary for the court to decide whether the Yield Maintenance Charges are properly considered part of the Bank's claim. Due to the court's valuation of the Mortgaged Properties and considering only the Bank's lien, the Debtor has no equity in the Mortgaged Properties even if the court were to find that the Yield Maintenance Charges should not be considered as part of the Bank's claim. Nevertheless, in completing its analysis, the court has assumed, without deciding, that the Yield Maintenance Charges should be excised from the Bank's claim. The court notes that it has also declined to decide the issue regarding the inclusion in the Bank's claim of the Yield Maintenance Charges in

---

[19]   The court has declined to include the remaining late charges as it is undisputed that at or near the time of the Receiver's appointment the Bank had accelerated the notes.

order to avoid any potential preclusive effect that could arise in later Tennessee state court judicial foreclosure proceedings.[20]

Accordingly, for purposes of determining the total liens against the property, the court will assume that the Bank's lien is valued at $ 21,397,767.

### (b) The Remaining Liens

Contrary to Debtor's contention, the Bank established the existence of the remaining liens against the Mortgaged Properties.

First, Rudolph Vasquez ("Vasquez"), Servicing Officer with C-III Asset Management LLC, servicer of the Bank's lien, testified that as part of his duties he periodically obtains a title report for the Mortgaged Properties. Referencing a title report dated April 3, 2012 (the "title report"), Vasquez testified—without objection—that the title report listed (I) "a Memorandum Order and Judgment . . . dated September 14, 2011" held by Amie Wingfield as plaintiff against Debtor; and (II) three tax liens. Tr. at 69-70. Debtor's counsel not only failed to object to this testimony but, in fact, asked the court to direct the witness to "orient" counsel to where on the title report the liens were indicated. Then, at the conclusion of Vasquez's testimony about the title report, the court notes that the following exchange occurred:

| | |
|---|---|
| MR. CAPRIOTTI: | Your Honor, I'm sorry. Is [the title report] being offered into evidence? |
| MR. SAMSON: | I don't think we need to unless you want me to. |
| MR. CAPRIOTTI: | I don't. |
| MR. SAMSON: | Okay. |

Tr. at 72.

---

[20] It is not disputed that the Loan Documents are governed by Tennessee Law. As it is unnecessary for the court to interpret the language of the Loan Documents to decide this motion, the court will defer the interpretation of the Loan Documents, if any such need arises, to the Tennessee courts.

Second, as suggested by the Bank's counsel at the hearing, the court takes judicial notice of the Debtor's sworn statements in its schedules. Debtor's schedules recognize the existence of the Wingfield Judgment and the three tax liens, albeit Debtor lists them as unsecured debts. Schs. E, F. When offered against a debtor, a debtor's schedules may be treated as judicial admissions. *See, e.g., In re Jorczak*, 314 B.R. 474, 482-83 (Bankr. D. Conn. 2004). Debtor's schedules are admissions to the extent that the debts are valid. Although the schedules indicate that the Wingfield Judgment is disputed and contingent, Debtor has failed to explain why the otherwise liquidated judgment is contingent or disputed such that it should not be considered.

Third, Delaney, Debtor's designated representative, admitted that there were liens on the property other than the Bank's lien. Ex. 22, at 20-23. Delaney acknowledged that there were a few state tax liens and an IRS levy. He also stated that there was "a million dollar judgment" obtained by Amie Wingfield "for an illness related to mold." *Id.* at 21. Although Delaney explained that the Wingfield Judgment was "somewhat infirm" because it was a default judgment, he then admitted that the Debtor had not taken action to appeal the judgment and instead was negotiating an offer and compromise with Ms. Wingfield. Ex. 22, at 30-31.

Fourth, Debtor stipulated that, at least as of September 20, 2010, it had defaulted under the terms of the Loan Documents because, inter alia, it "fail[ed] to pay taxes which had become due, which in turn resulted in multiple tax liens being attached to the Mortgaged Properties[.]" Joint Stip., at 4. The stipulation proceeds to list several tax liens, which, as previously noted, included an IRS levy and state tax liens filed by the Tennessee Department of Labor and Workforce Development and the Tennessee Department of Revenue.

In sum, the court finds that the Bank offered sufficient and competent evidence that established both the existence and amount of the liens against the property. To the extent that

Debtor claims that the evidence is insufficient to establish that the liens have been properly recorded, the court finds that it failed to rebut the Bank's evidence and the burden of going forward shifted to the Debtor to show that the liens were not properly recorded in accordance with state law.  *See Overhead Door Corp. v. Allstar Bldg. Prods., Inc. (In re Allstar Bldg. Prods., Inc.)*, 834 F.2d 898, 899-900 (11th Cir. 1987) (finding that the party opposing the creditor's motion for relief from stay has the burden to show that the security interest upon which the creditor desired to foreclose was not properly perfected under controlling state law).

Accordingly, the court finds the following liens in the designated amounts as valid for purposes of determining the total liens against the Mortgaged Properties:

| Lien | Amount |
|---|---|
| 1. Bank's Lien | $ 21,397,767 [21] |
| 2. Wingfield Judgment | $ 1,197,500 [22] |
| 3. Internal Revenue Service (tax lien) | $ 80,000 |
| 4. Tennessee Department of Labor and Workforce Development (tax lien) | $ 11,000 |
| 5. Tennessee Department of Revenue (tax lien) | $ 100,000 |
| **TOTAL** | $ 22,786,267 |

"The classic test for determining equity under section 362(d)(2) focuses on a comparison between the total liens against the property and the property's current value."  *Nantucket Investors II v. California Federal Bank (In re Indian Palms Assocs., Ltd.)*, 61 F.3d 197, 206 (3d Cir. 1995) (listing cases); *see Bowman v. Bond (In re Bowman)*, 253 B.R. 233, 238 (B.A.P. 8th Cir. 2000).    When compared, the total of the liens against the Mortgaged Properties,

---

[21] The court reiterates that it has assumed, without deciding, that the Yield Maintenance Charges are to be excluded from the Bank's claim.
[22] The court declines to include post-judgment interest on the Wingfield Judgment because there has been no direct request for the court to take judicial notice of the applicable post-judgment interest.

$22,786,267, exceeds the Mortgaged Properties' current value, $20,150,000, by $2.64 million.

Accordingly, the court concludes that the Debtor has no equity in the Mortgaged Properties.

## B. Necessity of the Mortgaged Properties to an Effective Reorganization

Having determined that the Bank under § 362(d)(2)(A) is an undersecured creditor, the

burden shifts to the Debtor to establish that the Mortgaged Properties are "necessary to an

effective reorganization." 11 U.S.C. § 362(d)(2)(B); *see* § 362(g). The Debtor must demonstrate

"not merely that if there is conceivably to be an effective reorganization, [the Mortgaged

Properties] will be needed for it; but that the [Mortgaged Properties are] essential for an effective

reorganization *that is in prospect.*" *United Sav. Ass'n v. Timbers of Inwood Forest Assocs., Ltd.*,

484 U.S. 365, 376 (1988). Without a proposed plan that has any reasonable prospect of success,

the Debtor is not entitled to the continuation of the automatic stay. *See id.* at 375-76.

> The test is one of feasibility. The debtor need not show that the plan is
> confirmable, *In re East-West Assocs.*, 106 Bankr. 767, 774 (S.D.N.Y. 1989), but
> that "the things which are to be done after confirmation can be done as a practical
> matter." *In re Ritz-Carlton of D.C., Inc.*, 98 Bankr. 170, 172 (S.D.N.Y. 1989)
> (Walker, J.) (quoting *In re Fenske*, 96 Bankr. 244 (Bankr. D. N.D. 1988)). "A
> motion for relief from the stay should not be turned into a confirmation hearing;
> the debtor need only show that where there is lack of equity, the proposed plan
> has a realistic chance of being confirmed and is not patently unconfirmable." *In re
> White Plains Dev. Corp.*, 140 Bankr. 948, 950 (Bankr. S.D.N.Y. 1992) (citation
> omitted).

*In re 160 Bleecker St. Assocs.*, 156 B.R. 405, 411 (S.D.N.Y. 1993). The Debtor's burden to

demonstrate a reasonable prospect of an effective reorganization increases with the passage of

time. *See Travelers Life & Annuity Co. v. Ritz-Carlton of D.C., Inc. (In re Ritz-Carlton of D.C.,

Inc.)*, 98 B.R. 170, 172 (S.D.N.Y. 1989).

This case has been pending for more than six months. A plan has not yet been filed.[23]

The court, therefore, must determine whether the Mortgaged Properties are necessary for an

---

[23] The Debtor's pending motion seeks to extend the exclusive period from October 2, 2012 to January 30, 2013.

effective reorganization that is in prospect based upon its understanding of the terms of the plan as contained in the record. Those terms can be easily summarized. The Debtor plans to pay the Bank's secured claim over an unspecified period of years at market interest rates, plus pay unsecured claims. Plan payments will be funded by the net operating income generated by the Mortgaged Properties. The plan will also likely provide for management of the Mortgaged Properties to be undertaken by a management company. No evidence was presented to suggest any additional alternative sources of funding.

*Plan's Realistic Chance of Being Confirmed*

Debtor argues that it has established that its net operating income has increased significantly over the past several months and is now sufficient to meet its operating expenses, including payment of a property management fee. However, the court concludes from the evidence presented that the net operating income available is woefully inadequate for this Debtor to fund a feasible plan of reorganization. The net operating income may support debt service, but no evidence was presented to demonstrate how this Debtor could pay for the $1.8 million of deferred maintenance expense necessary to stabilize the Mortgaged Properties, pay its priority tax claims as required by Code § 1129(a)(9) and provide a meaningful distribution to general unsecured creditors.

Furthermore, the Debtor has failed to meet its burden in establishing that it is likely under its proposed future management to maintain the income that the Receiver has achieved during his tenure. The Receiver testified that his professional background includes 13 years in commercial banking and the last 21 years in apartment management in the area where the Mortgaged Properties are located. It is undisputed that both the conditions and operations of the Mortgaged Properties have improved significantly under the Receiver's watchful eye. It is this court's

opinion that nothing short of the Receiver's efforts will be sufficient to continue the Mortgaged Properties trend toward stabilization and profitability. The Debtor did not have his proposed management team at the hearing to testify.

James Funicello testified that as part of the Debtor's proposed plan, PPI would become the property manager of the Tennessee based properties. According to Mr. Funicello, PPI owns and manages primarily commercial real estate located exclusively within New York State and has never managed property outside of New York. The son of Mr. Funicello, James, Jr., would relocate to Tennessee to manage the properties. Mr. Funicello testified that the extent of his son's experience is limited to management of a Syracuse-based residential property for a period of two years. James, Jr. was not called as a witness and was not present at the hearing.

The court has before it no hard evidence that Debtor's proposed new manager has the demonstrated credentials necessary to manage two Tennessee-based commercial properties with a combined 506 unit capacity. The Debtor, while at this point entitled to some leeway with respect to the specific terms of its plan, must meet its burden of proving that, as a practical matter, it will have a manager who has the level of expertise necessary to effectively manage the Mortgaged Properties, particularly given the history of this case. The court finds that the Debtor has not met its burden in this regard.

The record is clear that it is highly unlikely that the Bank will support any Debtor-sponsored plan. This presents a problem for the Debtor as regards Code § 1126(c)'s requirement of an affirmative vote of the class of unsecured creditors.[24]    For purposes of this analysis the court adopts its prior assessment of the value of the Bank's claim, subject to the same assumptions – $21,397,767. Based upon the Mortgaged Properties' value of $20,150,000, the

---

[24]  Code § 1126(c) provides in relevant part that "[a] class of claims has accepted a plan if such plan has been accepted by creditors ... that hold at least two-thirds in amount and more than one-half in number of the allowed claims of such class held by creditors ... that have accepted or rejected such plan."

Bank's general non-priority unsecured deficiency claim amounts to not less than $1,247,767. According to the Debtor's schedule F, total other general unsecured claims aggregate $1,380,439. Based upon these numbers, the Debtor requires affirmative votes by approximately $1,760,898 of the claims (*i.e.*, two-thirds in amount) for an acceptance by the unsecured creditor's class. Given the large unsecured portion of the Bank's claim, even were the Debtor to receive the affirmative vote of all other unsecured creditors, it cannot confirm a plan without the Bank's affirmative vote. *See, e.g., Resolution Trust Corp. v. Swedeland Dev. Group (In re Swedeland Dev. Group)*, 16 F.3d 552, 568 (3d Cir. 1994).

Finally, the court notes Debtor's emphasis on the fact that the Mortgaged Properties are the estate's sole assets and, without them, a reorganization is not possible. This fact alone is insufficient to defeat the Bank's Motion. *See In re Gunnison Center Apartments, LP*, 320 B.R. 391, 402 (Bankr. D. Colo. 2005) (citing *Albany Partners Ltd. v. Westbrook (In re Albany Partners, Ltd.)*, 749 F.2d 670, 673 n. 7 (11th Cir. 1984) ("[I]t must be demonstrated that an effective reorganization is realistically possible; the mere fact that the property is indispensable to the debtor's survival is insufficient.").

Because no effective reorganization of the Debtor is possible, it follows that the Mortgaged Properties are not necessary to that end. For the foregoing reasons, the Motion is granted, and the Bank is permitted to proceed to enforce its rights and remedies under its Loan Documents and applicable state law. In light of this disposition, the Receiver Motion is granted and Debtor's motion for a further extension of its exclusive period is denied.

So ordered.

Dated:  December 21, 2012
        Syracuse, New York

Margaret Cangilos-Ruiz
United States Bankruptcy Judge

Ridge Mountain, LLC - 12-31090
Memorandum-Decision and Order dated December 21, 2012

Appendix A
Valuation Analysis - Income Capitalization Approach

| Mountain Brook / Chattanooga Parcel | The Court | | Perutelli | | Poore | |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Gross Rent | $ 2,082,900 | at market rent of $620/month | $ 2,196,000 | at market rent of $654/month | $ 2,082,900 | at market rent of $620/month |
| Loss to Lease | not utilized | | not utilized | | $ (41,658) | at 2.0% of Gross Rents |
| Other Income | $ 85,000 | | $ 68,000 | | $ 85,000 | |
| Vacancy Loss | $ (119,235) | 5.50% | $ (135,840) | 6.00% | $ (102,062) | 5.00% |
| Collection Loss (1%) | $ (21,679) | | $ (22,640) | | $ (20,412) | |
| **Effective Gross Income ("EGI")** | $ 2,026,987 | per unit - $7,239 | $ 2,105,520 | per unit - $7,520 | $ 2,003,768 | per unit - $7,156 |
| **Expenses** | | | | | | |
| Real Estate Taxes | $ 219,439 | | $ 219,439 | | $ 136,340 | |
| Replacement Reserves | $ 81,200 | at $290/unit | $ 81,200 | at $290/unit | $ 56,000 | at $200/unit |
| Other Expense Categories | $ 895,298 | | $ 883,566 | | $ 907,029 | |
| Insurance | | | $ 58,800 | | $ 49,000 | |
| Utilities | | | $ 184,800 | | $ 196,000 | |
| Repairs/Maintenance | | | $ 196,000 | | $ 154,000 | |
| Payroll/Benefits | | | $ 268,800 | | $ 280,000 | |
| General/Administrative | | | $ 112,000 | | $ 91,000 (General/Administrative*) | |
| Management (3% of EGI) / (4% of EGI) | | | $ 63,166 | | $ 80,151 | |
| Other | | | $ - | | $ 56,878 | |
| *includes Advertising & Promotion | | | | | | |
| **Total Expenses** | $ 1,195,937 | per unit - $4,271 | $ 1,184,205 | per unit - $4,229 | $ 1,099,369 | per unit - $3,926 |
| **Net Operating Income** | $ 831,050 | per unit - $2,968 | $ 921,315 | per unit - $3,290 | $ 904,399 | per unit - $3,230 |
| **Capitalization Rate** | 6.50% | | 7.70% | | 6.50% | |
| **Stabilized Value** | $ 12,785,385 | $ 12,800,000 as Rounded | $ 11,965,130 | $ 12,000,000 as Rounded | $ 13,913,831 | $ 13,900,000 as Rounded |
| **Adjustments to Stabilized Value** | | | | | | |
| Deferred Maintenance ("DM") | $ (1,134,974) | | $ (1,213,876) | | $ (591,025) | |
| Lease-Up Costs | $ (26,250) | 3 mth @ avg $8,750/month | $ (34,000) | | $ (27,000) | |
| Entrepreneurial Profit on DM | $ (204,295) | at 18% of DM | $ (218,498) | at 18% | not utilized | |
| **Total Adjustments** | $ (1,365,519) | | $ (1,466,374) | | $ (618,025) | |
| **"As Is" Value** | $ 11,419,865 | $ 11,450,000 as Rounded | $ 10,498,756 | $ 10,500,000 as Rounded | $ 13,295,806 | $ 13,300,000 as Rounded |

Ridge Mountain, LLC - 12-31090
Memorandum-Decision and Order dated December 21, 2012

## Appendix A
### Valuation Analysis - Income Capitalization Approach

| Ridgemont / Red Bank Parcel | The Court | | Perutelli | | Poore* | |
|---|---|---|---|---|---|---|
| **Income** | | | | | | |
| Gross Rent | $ 1,627,440 | at market rent of $600/month | $ 1,807,680 | at market rent of $667/month | $ 1,627,440 | at market rent of $600/month |
| Loss to Lease | not utilized | | not utilized | | $ (65,098) | at 4.0% |
| Other Income | $ 78,000 | | $ 60,000 | | $ 78,000 | |
| Vacancy Loss | $ (93,799) | 5.50% | $ (112,061) | 6.00% | $ (78,117) | 5.00% |
| Collection Loss (1%) | $ (17,054) | | $ (18,677) | | $ (15,623) | |
| **Effective Gross Income ("EGI")** | $ 1,594,586 | per unit - $7,056 | $ 1,736,942 | per unit - $7,686 | $ 1,546,602 | per unit - $6,843 |
| | | | | | *Revised to account for collection loss omitted from appraisal | |
| **Expenses** | | | | | | |
| Real Estate Taxes | $ 139,939 | | $ 139,939 | | $ 93,892 | |
| Replacement Reserves | $ 65,540 | at $290/unit | $ 65,540 | at $290/unit | $ 45,200 | at $200/unit |
| Other Expense Categories | $ 776,087 | | $ 762,878 | | $ 789,296 | |
| | | | Insurance $ | 47,460 | Insurance $ | 39,550 |
| | | | Utilities $ | 183,060 | Utilities $ | 209,050 |
| | | | Repairs/Maintenance $ | 153,680 | Repairs/Maintenance $ | 124,300 |
| | | | Payroll/Benefits $ | 236,170 | Payroll/Benefits $ | 226,000 |
| | | | General/Administrative $ | 90,400 | General/Administrative** $ | 80,230 |
| | | | Management (3% of EGI) $ | 52,108 | Management (4% of EGI)* $ | 61,864 |
| | | | Other $ | - | Other $ | 48,302 |
| | | | | | **includes Advertising & Promotion | |
| **Total Expenses** | $ 981,566 | per unit - $4,343 | $ 968,357 | per unit - $4,285 | $ 928,388 | per unit - $4,108 |
| **Net Operating Income** | $ 613,020 | per unit - $2,712 | $ 768,585 | per unit - $3,401 | $ 618,214 | per unit - $2,735 |
| **Capitalization Rate** | 6.50% | | 7.70% | | 6.50% | |
| | | as Rounded | | as Rounded | | as Rounded |
| **Stabilized Value** | $ 9,431,077 | $ 9,450,000 | $ 9,981,623 | $ 10,000,000 | $ 9,510,985 | $ 9,500,000 |
| **Adjustments to Stabilized Value** | | | | | | |
| Deferred Maintenance ("DM") | $ (622,458) | | $ (665,731) | | $ (231,760) | |
| | | 3 mth @ avg $8,250/month | | | | |
| Lease-Up Costs | $ (24,750) | | $ (30,000) | | $ (27,000) | |
| Entrepreneurial Profit on DM | $ (112,043) | at 18% | $ (119,832) | at 18% | not utilized | |
| **Total Adjustments** | $ (759,251) | | $ (815,563) | | $ (258,760) | |
| | | as Rounded | | as Rounded | | as Rounded |
| **"As Is" Value** | $ 8,671,826 | $ 8,700,000 | $ 9,166,061 | $ 9,200,000 | $ 9,252,225 | $ 9,250,000 |

Ridge Mountain, LLC - 12-31090
Memorandum-Decision and Order dated December 21, 2012

## Appendix B

Itemized Claim of U.S. Bank, N.A., successor in interest to Bank of America, N.A., successor by merger to LaSalle
Bank, N.A., as trustee for the registered holders of J.P. Morgan Chase Commercial Mortgage Securities Corp.,
Commercial Mortgage Pass-Through Certificates, Series 2004-CIBC9

as revised November 21, 2012 (Doc. No. 89)

Note A*

| | | | |
|---|---|---|---|
| Principal | $ | 15,618,080.51 | |
| Per Diem (Interest) | | | $ 2,759.19 |
| Interest Due | $ | 1,859,696.91 | |
| Appraisals | $ | 11,500.00 | |
| Appraisal Review | $ | 6,200.00 | |
| ESA  (Environmental Services) | $ | 6,650.00 | |
| ESA Review | $ | 2,600.00 | |
| Legal | $ | 170,199.50 | |
| Advance Taxes (Real Estate) | $ | 123,934.64 | |
| Surveys | $ | 23,725.00 | |
| Court and Travel | $ | 1,778.85 | |
| Advance Insurance | $ | 49,154.51 | |
| PCR (Property Condition Report) | $ | 15,900.00 | |
| PCR Review | $ | 1,100.00 | |
| Advance of Operating Expenses | $ | 136,654.78 | |
| Lien Search | $ | 1,037.78 | |
| **Late Charges** | $ | **247,746.40** | |
| **Default Interest** | $ | **1,579,161.47** | |
| **Default Interest Previous** | $ | **96,960.84** | |
| **Defeasance ("Yield Maintenance Charge")** | $ | **1,823,721.78** | |

Total    $    **21,775,802.97**

Note B*

| | | | |
|---|---|---|---|
| Principal | $ | 1,066,443.00 | |
| Per Diem (Interest) | $ | - | $ 377.70 |
| Interest Due | $ | 357,680.54 | |
| **Late Charges** | $ | **29,789.10** | |
| **Default Interest** | $ | **107,710.65** | |
| **Prepayment ("Yield Maintenance Charge")** | $ | **254,894.23** | |

Total    $    **1,816,517.52**

Total Claim (Notes A & B)    $    **23,592,320.49**

*Bold Items are disputed by Debtor

Ridge Mountain, LLC - 12-31090
Memorandum-Decision and Order dated December 21, 2012

## Appendix C
### Excerpt - Promissory Notes A and B (Exs. 1 and 2)

ARTICLE I – TERMS AND CONDITIONS

    1.06   Event of Default.    It is hereby expressly agreed that should any default occur in the payment of principal or interest . . . and such payment is not made within seven (7) days of the date of such payment is due . . . , or should an **"Event of Default"** (as defined in the Security Instrument) occur, or should any other default occur under any of the Loan Documents which is not cured within any applicable grace or cure period, then an "Event of Default" shall exist hereunder, and in such event the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall, at the option of Lender and without notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.

    1.07   Late Charges and Default Interest Rate.    In the event that any payment is not received by Lender on the date when due . . ., then in addition to any default interest payments due hereunder, Borrower shall also pay to Lender a late charge in an amount equal to five percent (5.0%) of the amount of such overdue payment. So long as any Event of Default exists hereunder, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or otherwise), interest shall accrue on the outstanding principal balance of this Note at a rate per annum equal to four percent (4.0%) plus the interest rate which would be in effect hereunder absent such default or maturity . . . (the **"Default Interest Rate"**), and such default interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or Event of Default, and such late charges and default interest are reasonable estimates of those damages and do not constitute a penalty.